JOEL C. KOURY
Attorney at Law
3435 Ocean Park Blvd., Suite 107-50
Santa Monica, California 90405
Telephone: (424) 248-8670
Facsimile: (866) 829-9412
Email: jckoury@aol.com

Attorney for Defendant
THOMAS M SHEPOS

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: CR 18-CR-569 |
|---|---|
| Plaintiff, | **DEFENDANT THOMAS SHEPOS' SENTENCING MEMORANDUM; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| THOMAS M SHEPOS, | Hearing Date: January 19, 2023<br>Time: 8:00 a.m.<br>Department: 9D |
| Defendant. | **Before the Honorable George H. Wu** |

TO THE HONORABLE GEORGE H. WU, UNITED STATES DISTRICT COURT JUDGE, AND ASSISTANT UNITED STATES ATTORNEYS LINDSAY DOTSON AND RICHARD PARK:

  PLEASE TAKE NOTICE that on the date and time set forth above, or as soon thereafter as counsel may be heard, Defendant Thomas M Shepos, by and through his attorney of record, Joel C. Koury, hereby files his sentencing position requesting a twenty-four month probationary sentence.

This motion is based on this notice, the points and authorities in support thereof, all files and records in this case, and any further information as may be presented regarding this motion. Mr. Shepos requests the opportunity to supplement his motion should it become necessary.

DATED: January 14, 2023                    Respectfully submitted,

                                           _____/s/_____
                                           JOEL C. KOURY
                                           Attorney for Defendant

# **TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................................1

II.  PROCEDURAL HISTORY ..................................................................................3

III. OBJECTION TO ASSERTIONS MADE IN LOS ANGELES COUNTY'S VICTIM IMPACT LETTER ..................................................................................3

IV.  MR. SHEPOS' HISTORY AND CHARACTERISTICS .....................................4

   A. At the Time the Offense Conduct Began, Mr. Shepos Was Financially Strained, Trying to Meet the Demands from a Failed Toxic Marriage, and Addicted to Alcohol and Gambling..............................................................4

   B. In 2016, Mr. Shepos Turned His Life Around and Began His Six-Year Cooperation with the Government, Which Resulted in the Successful Prosecutions of Three Participants in the Fraud Scheme ..................................6

   C. Mr. Shepos Has Family Support, Which Will Ensure His Continued Success Out in the Community ........................................................................7

V.   GOALS OF SENTENCING...................................................................................8

   A. A Probationary Sentence Adequately Reflects the Seriousness of the Offense and Promotes Respect for the Law ....................................................8

   B. A Twenty-four Month Probationary Sentence Also Serves the Goal of Deterrence .........................................................................................................9

   C. A Probationary Sentence Also Avoids Unwarranted Sentence Disparities .......................................................................................................10

VI.  CONCLUSION ....................................................................................................10

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

On November 19, 2018, two months after the government formally charged Thomas Shepos in the instant case (Dkt 1), Mr. Shepos pled guilty to making a materially false statement to the FBI and to filing a false tax return for the calendar year of 2014. During the time of the offense conduct, Mr. Shepos was embroiled in a toxic and tumultuous divorce and facing financial insolvency; he had turned to heavy drinking and gambling to cope with his personal and financial stress. It was in this desperate and chaotic frame of mind that he engaged in a period of terrible decision-making. These poor decisions have placed him before this Court in the instant case.

Today, Mr. Shepos is 73 years old. Since 2016, he has undergone a remarkable transformation. After his initial untruthful interview with the FBI, which is the subject of Count One, he immediately changed course and thoroughly and completely began cooperating with the FBI, the IRS and the United States Attorney Officer.

Over the last six years, as an active cooperator, he was instrumental in furthering the investigation and prosecution three additional participants in a county wide corruption scheme and bribery ring, namely, Contractor Enrique Contreras, County Official Mohammad R. Tirmazi, and Real Estate Developer Arman Gabaee. He helped the government identify countless other individuals as well.

During the federal investigation, Mr. Shepos wore a wire over a dozen times and recorded countless hours of conversation that helped the government establish its cases against these individuals. He conducted meetings at the behest of the FBI with individuals targeted in the investigation, and he met regularly with the FBI and IRS to report on the target's activities. While working for the FBI and IRS since 2016, he collected bribes turning over every single dollar to the FBI and IRS as evidence for their ongoing investigations.

Also, Mr. Shepos was prepared to testify at Mr. Gabaee's trial, which ultimately contributed to the latter's decision to plead guilty. As a result of Mr. Shepos' cooperation, Contreras was ultimately sentenced to twenty-four months of custody and $821,366 in restitution. Tirmazi was sentenced to twelve months and a day and ordered to pay $420,010 in restitution. Gabaee was sentenced to forty-eight months in prison and ordered to pay a fine of $1.149 million. Mr. Shepos' cooperation was significantly greater and occurred much earlier than that of Mr. Contreras and Tirmazi.

Mr. Shepos' continuous cooperation, which he believes was the only way to make amends for what he did, came at a significant cost. Because of his pending sentencing and the need to protect the integrity of the government's and county's investigations, he was unable to fully explain details of his finances during the most recent divorce proceedings. As a result, the superior court imposed a million-dollar judgment on him.

Mr. Shepos, because of his age and the nature of these convictions, is unable to find work to support himself; in the last few years, he trained and tried to take a job selling insurance, but lost that job after California revoked his insurance license due to this criminal conviction. With his age, little to no employment prospects, no remaining assets and millions of dollars in restitution from our case and his divorce case, he is completely dependent on family and friends to simply survive.

As verified by the FBI, the IRS and the US Probation Office, he has absolutely no money, no stocks, and no assets other than a 2016 Honda CRV that he has a lien on it by the financing company that holds the title. When that car breaks down or needs to be replaced, Mr. Shepos will own nothing and is in danger of becoming homeless without the financial support of friends and family. (Pre-Sentence Investigation Report, hereinafter "PSR," at p. 17-21, ¶ 54-72).

His monthly expenses which are now significantly higher than his fixed income resulting in a deficit of $1,275.43 each and every month, with no prospects to every improve. *Id.* Despite his financial limitations, Mr. Shepos has been setting aside

restitution payments with the Clerk of the Central District to be transferred to the IRS following this sentencing.

He is now completely financially dependent on his family and friends for the remainder of his life and incarceration will only weaken rather than strength his support network.

There is no reason to speculate whether Mr. Shepos will comply with the terms of probation, we have six years of evidence that demonstrate his probationary perform will be exemplary. For these reasons, Mr. Shepos concurs with the government's request that Mr. Shepos be sentenced to twenty-four months of probation with on order for restitution to the IRS $110,021 to the Internal Revenue Service with credit for the funds collected by the Central District Clerk's officer is the most just resolution of his case.

## II. PROCEDURAL HISTORY

The government filed an Information against Mr. Shepos on September 5, 2018, alleging one count of making false statements, in violation of 26 U.S.C. § 1001(a)(2) ["Count One"], and one count of subscribing to false tax returns, in violation of 26 U.S.C. § 7206(1) ["Count Two"]. (Dkt 1.) On September 5, 2018, the government filed the parties' Plea Agreement (Dkt 9), and Mr. Shepos later pled guilty to Counts One and Two on November 19, 2018 (Dkt 27). His sentencing is currently set for January 19, 2023 (Dkt 69).

## III. OBJECTION TO ASSERTIONS MADE IN LOS ANGELES COUNTY'S VICTIM IMPACT LETTER

Los Angeles County has tried to assert that it is a victim in the instant offense, when in fact this is simply not true. Mr. Shepos pled guilty to lying to the FBI and failing to report income to the IRS; LA County is not a victim to the charged crimes. Furthermore, the County's claim that Mr. Shepos caused the County to lose money by approving "above-market" lease prices is plainly false and nonsensical.

Winning bids for County contracts are mandated to go the lowest bidders. Mr. Shepos would use the bid information to assist vendors in lowering their bid in order to secure the contract. While this undoubtedly harmed innocent bidders who submitted quotes in good faith, this was not to the County's detriment; quite the opposite; this repeatedly resulted in substantial savings for the county when the winning bid undercut the competition.[1]

Finally, Mr. Shepos offered repeatedly to meet with the County to assist with the investigation if they would simply offer Mr. Shepos immunity from state charges. But they repeatedly refused and continue to refuse his assistance.[2] The County elected to investigate without Mr. Shepos' assistance and after years of investigation still cannot offer one single example, where Mr. Shepos' information resulted in the county losing money. During the years of cooperation and dozens of proffers with FBI and IRS investigators, the Government acknowledges that Mr. Shepos helped the government "gather evidence of crimes as they were happening in real time and in a manner to stop them before completion" and "exposed multiple bribery schemes that would have continued unabated **but for defendant**." (Gov't position papers at p. 9. Emphasis added.)

### IV. MR. SHEPOS' HISTORY AND CHARACTERISTICS

**A. At the Time the Offense Conduct Began, Mr. Shepos Was Financially Strained, Trying to Meet the Demands from a Failed Toxic Marriage, and Addicted to Alcohol and Gambling**

Mr. Shepos married his now-former wife Karen Gluck in 1996. (Pre-Sentence Investigation Report, hereinafter "PSR," at p. 14, ¶ 76). During the marriage Mr. Shepos experienced an inordinate amount of stress, which peaked around the time he was building a second family home in Bel Air, California.

---

[1] In multiple proffer sessions with the FBI and the IRS, Mr. Shepos provided specific examples where the County lease bids were reduced by the parties bribing him in order to secure the contract and gain a long term stable tenant. He also offered specific examples, where the political actors refused to take his advice to purchase properties rather than lease them which would have resulted in the County making substantially more money each month rather than spend it but his advice was overruled by political actors.

[2] See the attached email marked as Exhibit A.

During the marriage, Mr. Shepos tried to provide for Karen and their daughter Hanna. This Karen, who has never held a job to this day, lived at their Santa Monica home with Mr. Shepos and their daughter with in a full time live in housekeeper and nanny. (*Id.* at ¶ 79). She made constant outrageous financial demands of Mr. Shepos during their marriage and throughout their separation/divorce proceedings. (*Id.* at ¶¶ 78-79).

He was drinking heavily to cope with this toxic relationship and Karen's increasingly unreasonable financial demands.[3] (*Id.* at ¶ 77). When Karen threatened to leave him, Mr. Shepos tried to prove his commitment to the marriage by entering into a disproportionately one-sided post-nuptial agreement wherein he agreed to give up his interest in the family homes in Bel Air and Santa Monica and agreed to spousal and child support plus pay all of Karen's living expenses hoping that this would prove his commitment to their relationship. (*Id.*) Exactly 365 days after Karen obtained Mr. Shepos' signature on the post-nuptial agreement, she filed for divorce in 2013. (*Id.*) Mr. Shepos found himself responsible for all of Karen's obligations forever more.

Mr. Shepos was stressed financially, legally, and emotionally. Unable to keep up with his expenses or to save his toxic marriage, he turned to heavy alcohol use to avoid dealing with the constant and unrelenting financial pressure. It was at this time, that he began accepting bribes through his job. Mr. Shepos knew that his actions were illegal. However, in desperation and clouded by addiction with the relentless demands of his wife, Mr. Shepos fell deeper into a downward spiral.

On November 21, 2016, the FBI interviewed Mr. Shepos for the first time. In desperation, he initially tried to evade accountability and avoid the hopeless situation that

---

[3] While this case was pending, Ms. Gluck spent over $300,000 in attorney fees to secure a million-dollar judgement against Mr. Shepos. Despite knowing that this judgement is worthless because it will never be collected since Mr. Shepos has no assets or ability to ever repay it. While it is impossible to know if her litigation was motivated by unscrupulous advice from the attorney who was enriched during the litigation or her own quest for vengeance, what is known is irrefutable; if she had put that same amount of money into a mutual fund, she would have been able to put a downpayment on a home or paid for a college education at an Ivy League school for her daughter or had substantial retirement nest egg. Instead, she has a worthless judgment and a collection of cancelled checks payable to her attorney.

he found himself in. A few weeks after that first interview, Mr. Shepos made the decision to change course and immediately and completely cooperate with the FBI, IRS and the investigating prosecutors. On December 15, 2016, Mr. Shepos met again with the FBI. From that date through the present, Mr. Shepos has never looked back. He has proven himself to be a reliable and truthful witness, whose cooperation helped to further the government's investigation and expose others' corruption schemes.

### B. In 2016, Mr. Shepos Turned His Life Around and Began His Six-Year Cooperation with the Government, Which Resulted in the Successful Prosecutions of Three Participants in the Fraud Scheme

Mr. Shepos' level of cooperation has been long-lasting, fruitful, and reliable. Although he initially lied to the FBI, he immediately reversed course and has been on a positive, lawful trajectory ever since. He has participated in numerous interviews with the government, giving law enforcement countless names and reliable information. He also turned over incriminating records, wore concealed wires to capture interviews and collected intelligence on the targets of investigation, and obtained valuable information about corruption and bribery that could not otherwise have been easily obtained by law enforcement. As a result, the government was able to gather evidence against, indict, and convict Gabaee, Contreras, and Tirmazi. This Court ordered Contreras, Tirmazi, and Gabaee to pay approximately $2,390,376 in collective restitution and fines.

Mr. Shepos' cooperation came at a high price to him personally. One year to the day that he and his now-ex wife Karen entered into their post-nuptial agreement, in which he agreed to support her and give her the entire ownership stake in their multi-million dollar family homes in Santa Monica and Bel Aire, she filed for divorce to enforce the agreement against him. Furthermore, after Karen learned that Mr. Shepos had pled guilty in the instant case, she was convinced that he had squirreled away money from her and demanded to receive more during the divorce proceedings leveraging Mr. Shepos inability to reveal the details of his ongoing cooperation into a million dollar judgment

from the Los Angeles Superior Court. In reality, all the money he received as a result of the offense conduct had already been spent year ago paying past his and Karen's bills.

Mr. Shepos has had six long years to reflect on his poor choices. He understands that his unlawful actions have not only hurt himself, but also harmed others. As a public official for twenty years, he was in a successful position of trust. He abused that trust and prevented multiple business contractors from receiving a fair opportunity to compete for County contracts while unethically and illegally accepting bribes from vendors that lowered their bids to get a strategic advantage over competing bidders.

He does not, however, want that the breach of this trust to be his sole, lasting legacy. For the past six years, he has worked hard to try to make amends the harm he caused. Since 2016, Mr. Shepos has been honest, trustworthy, and willing to go to extraordinary lengths to cooperate with the government. Most importantly, he has proven that he is willing to and capable of change. He has been out of custody and living in the community for six years without any violations. He has shown the Court that, given the opportunity, he is no risk to reoffend and will lead a law-abiding life.

### C. Mr. Shepos Has Family Support, Which Will Ensure His Continued Success Out in the Community

Mr. Shepos is now in a supportive, loving relationship with his girlfriend Michele Lantz. (PSR ¶ 80). She has been with him throughout the time he began cooperating and has been a stable influence in his life. Mr. Shepos is also close to his oldest two daughters Kristen and Tracey. The presence of his girlfriend Michele, his oldest two children, his grandchildren, and his friends have helped create an important support network for Mr. Shepos.[4]

They will help ensure that he continue on a positive path going forward. But most important, he has been honest and open with everyone about the mistakes he has made.

---

[4] Tragically, his daughter Hanna will not communicate with him or visit with him except to ask for money periodically. She is Karen's daughter.

He is no longer in an unhealthy relationship and has no means or opportunity to ever reoffend.

## V. GOALS OF SENTENCING

### A. A Probationary Sentence Adequately Reflects the Seriousness of the Offense and Promotes Respect for the Law

The defense concurs with the government's recommendation with a twenty-four month probation sentence with $110,021 in restitution payable to IRS, offset by the funds that Mr. Shepos has already deposited with the Clerk of the Court for restitution.

The offense that Mr. Shepos committed was undoubtedly serious, but Mr. Shepos has also paid a high price for his crimes. He immediately recognized the error of lying to the FBI and thereafter almost immediately admitted to his part in this scheme and began the invaluable work of exposing county wide fraud.

As the government has noted, his cooperation saved the county and law enforcement "innumerable resources." He has provided information, he has actively participated with law enforcement by wearing a wire, he has provided information beyond the three parties who have been indicted, he has recorded meetings with targets of the government's investigation and worked as an agent of law enforcement.

He has also turned over every single dollar that he collected as part of the FBI's and IRS's investigation since 2016. He was prepared to testify against one target, contributing to that target entering a plea one week prior to his jury trial.

Also, Mr. Shepos, to protect the integrity of the federal government's investigation, followed his attorney's advice and refused to divulge the details of his cooperation and work with the FBI in his divorce proceedings, resulting in an adverse million-dollar judgement. The government has appropriately characterized Mr. Shepos cooperation as "early, extensive, fulsome and significant."

In short is it difficult to imagine a cooperating defendant doing more than what Mr. Shepos did in connection with this investigation.

He has proven himself time and again to be truthful and reliable with law enforcement as characterized by the government, "cooperating at every turn and in every way the government has asked" and was an "integral part of rooting out systemic corruption in the County." (Gov't Sentencing Memo P. 10).

A twenty-four month probationary sentence, is more than adequate to reflect the seriousness of the crime and promote compliance with the law considering Mr. Shepos' extraordinary cooperation, his age and his limited future job prospects combined with the devastating financial predicament that he now faces for the rest of his life.

### B. A Twenty-four Month Probationary Sentence Also Serves the Goal of Deterrence

A probationary sentence is more than adequate to ensure that Mr. Shepos will not commit future crimes. These conditions, in conjunction with his continued restitution payments, certainly promotes the goal of deterrence of future crimes.

The severe collateral consequences in this case will permanently affect Mr. Shepos for the rest of his life. He will forever have the stigma of two federal felony convictions. Being labeled as a convicted felon has already cost Mr. Shepos any opportunity to practice in his field. His criminal record will also make it challenging for him to be trusted within any professional environment or business, as evidenced by California's revocation of his insurance license after he tried to obtain new employment. Given his advanced age and suffocatingly large divorce settlement, he will be largely dependent on the generosity of friends and family to try to meet his expenses forever.

Furthermore, at the time the offense conduct took place, Mr. Shepos was desperately trying to work through a toxic relationship that continuously left him in need of money. The stress of being unable to meet the constant, exorbitant and rapacious financial demands of a venomous ex-wife, plus his unhealthy coping mechanisms medicating with alcohol and gambling, contributed to Mr. Shepos' willingness to engage in the criminal behavior that gave rise to this case.

DEFENDANT THOMAS SHEPOS' SENTENCING MEMORANDUM

9

But the events that made this the most difficult period of Mr. Shepos' life are unlikely to ever re-occur. Today, Mr. Shepos is a sober, principled man living a life of integrity. He is a secretary at multiple Alcoholics Anonymous meetings and no longer addicted to alcohol or gambling. Clear-headed, he understands how harmful it was to abuse his position of trust. He is also in a healthy and supportive relationship with his girlfriend of six years. He has learned from his mistakes, paid dearly for his crimes, and is determined to move forward.

### C. A Probationary Sentence Also Avoids Unwarranted Sentence Disparities

A probationary sentence for Mr. Shepos is warranted by his extraordinary, early and extensive level of cooperation especially in light of the fact that Courts sentenced Contreras to twenty-four months of custody and $821,366 in restitution; Tirmazi to twelve months and a day of custody and $420,010 in restitution; and Gabaee to forty-eight months in prison and a fine of $1.149 million. Mr. Shepos' cooperation was much earlier and extraordinarily greater than that of Contreras and Tirmazi. In comparison to the conduct of those other defendants and considering Mr. Shepos's extraordinary and robust cooperation, a probationary sentence is sufficient but not greater than necessary to comply with the purposes of sentencing.

## VI. CONCLUSION

For the foregoing reasons, Mr. Shepos respectfully requests that this Court impose a sentence of twenty-four months in custody with restitution to the IRS in the amount of $110,021 minus the amount that he has previously lodged with the Clerk of the Court..

DATED: January 14, 2023                         Respectfully submitted,

                                                  /s/
                                                JOEL C. KOURY
                                                Attorney for Defendant